11031.4 Romar Transportation v. Mark Karuba May it please the appellate court, counsel. My name is Ralph Berkey. I represent Romar Transportation and the Illinois Insurance Guarantee Fund. I'm opposed by my friend Robert Cozy, who represents Mark Karuba. Your Honors, the determinative question in this case is whether trauma to the petitioner's nose accelerated the natural pre-existing deterioration of his rod-cone dystrophy, a lifetime hereditary condition that would inevitably have blinded Mark Karuba. Whether or not trauma to the petitioner's nose accelerated the natural deterioration of his pre-existing and inevitably blinding condition of rod-cone dystrophy, we ask that the decision of the Industrial Commission, a two-to-one decision, be reversed, because the medical opinion upon which it is based, that being the opinion of Dr. John Fournier, is faulty. We believe that the dissent in the Commission's decision by Commissioner Lindsay should have been dispositive of the case, and her reasoning should have been accepted. So why is Fournier's opinion faulty? Number one, it is unscientific, and it should have been excluded as a matter of law. Number two, even if it found its way into evidence, it is so wildly contrary to the manifest weight of the evidence that the decision should be overturned. As I said, Mr. Karuba suffered the unfortunate hereditary condition that would have inevitably have blinded him. And nobody's disputing that, right? Nobody's disputing that. He was whacked in the nose by a swinging door at work in April of 1997, which fractured his nose. He received some immediate care at an industrial clinic where they diagnosed a fractured nose and sent him on his way with appropriate care for the fractured nose. And so in essence, Fournier says that this accident caused the condition to progress or to accelerate. Well, that's very interesting. He says that it progressed. Caused it to progress. Right. Right. So the workplace accident in general, as you know, accelerates the preexisting condition, and that is compensable generally. No doubt. Okay. So is there not arguably some evidence in the record to support the commission's decision? I think the answer would have to be yes, but you're challenging the legitimacy of that opinion apparently. I am. And you said in conclusionary form that it's unscientific, but why is it unscientific? May I speak to the manifest weight first, Your Honor, and return to the unscientific? Sure. When we get to manifest weight, you are charged with weighing evidence. You can't just look at one report, one piece of evidence and say, oh, that's sufficient to sustain an award. It might be sufficient in the absence of other evidence, but you're charged with comparing this evidence. We are commissioners, actually. We review the commission's decision. They're charged with it. We don't weigh evidence in that sense. We look at whether or not an opposite conclusion is clearly apparent. But in order to do that, you must look at the other evidence and see if there is. We don't determine what weight to give. Well, merely examining whether the appellee has sufficient evidence to support the decision does not answer the question before you, whether the appellant possesses the manifest weight of the evidence. You aren't charged to wall yourself off from evidence. You must look at the whole record. Okay? Okay? As to manifest weight. The Respondent's... I think you've got that backwards. We determine whether the commission's decision is against the manifest weight of the evidence, not whether he has the manifest weight. But you can't know that unless you examine the other evidence. But we can't. We don't give it weight. We have to accept what the commission gives for weight. And the commission says, I believe Dr. A and don't believe Dr. B, then it's Dr. A's opinion that's going to carry the day. Unless there's something wrong with it. Now, what's wrong with it? What's wrong with it is that it is wildly contrary. Says who? Well, I'd like to tell you. Other than Dr. Goldenbrenner? Goldenbrenner. Dr. Goldenbrenner performed her own analysis and formed the opinion that trauma does not accelerate rod-cone dystrophy. Not only did she do that, she examined all the medical literature on the topic. Nowhere has anyone ever expressed the opinion that trauma accelerates rod-cone dystrophy. Nobody. Dr. Fournier is the only physician in the history of medicine to express this opinion. You must have done some wide research to come up with that conclusion. Dr. Goldenbrenner did. No. And Dr. Fournier admits he could find no evidence, no support elsewhere for his opinion. Could this perhaps be the first time? Well, counsel raised that in his brief, and the point he's trying to make is, well, Dr. Fournier isn't wrong, he's just the first one. Well, maybe he is. But if he were the first one, if he were, we say that his actions after making this momentous discovery that trauma can accelerate this rare condition, his actions after discovering this bely his opinion. What do doctors want most? Well, let's make it second most. They want to have a disease named after themselves. DePython's contracture. Hansen's disease. Dr. Fournier, if he really believed this, he would have rushed to publish. Why are we the only ones that Dr. Fournier is telling about this revelation that he has come upon? Is he the Christopher Columbus of medicine? Has he just discovered the new world? Well, he's never written on the subject, never commented to anybody on the subject, despite a list of publications in his CV. He's familiar with publication. He also claims to be an editor of a journal. He has a facility to do so. Of course, you move for a FRI hearing before the arbitrator? Pardon me, sir? You move for a FRI hearing before the arbitrator? We did not make a formal FRI hearing. Is it waived then? Do you move or make the FRI arguments before the commission? We argued FRI before the commission. But if you don't make the motion for a FRI hearing before the arbitrator, what's the commission supposed to do about it? They can't take evidence. The curious evidentiary procedures at the industrial commission, I believe, make our objection as to scientific basis a sufficient objection. Well, if you want us to take judicial notice of what goes on at the commission is rather curious, we'll probably do that. But the fact of the matter is if you want a FRI hearing, you've got to ask for one. And if you don't ask for one, it occurs to me the only thing you're doing is arguing that Dr. Colton Brenner's opinions should have been accepted over Dr. Fournier's. And you are going to wait. Well, if that is. What a misability. So if there is a question about misbehavior or waiver of FRI, the industrial commission's procedures, as you may know, are rather curious. You take the doctor's, the expert depositions before. Remarkably, you take depositions of experts before the testimony of the petitioner, before the trial. Now, if there is an evidentiary objection during the course of an expert deposition, we are only obligated to object if it goes to the matters that could be corrected during the deposition. Whether a doctor is behaving unscientifically or not is not something that he can correct during his deposition. It is when the objection is proper, when the deposition is offered into evidence. But no objection was made at that point in time under FRI. Pardon me? You didn't ask for a FRI hearing at that point in time. We didn't know it was necessary until then. Well, I mean, do you contend that you thought it was admissible then? When you were possessed with knowledge that in your belief that this is voodoo? We take the doctor's deposition and form the opinion that he does not have a scientific basis. And then you ask for a FRI hearing. No, we don't. Well, when your opponent seeks to introduce that deposition, you say, excuse me, I want a FRI hearing. This is inadmissible. This is. . . We objected on the basis of unscientific, on the basis that it was not scientific at the time it was offered. We fulfilled that requirement. The procedures at the commission would have easily allowed, oh, okay, let's continue the case or let's have a hearing on that. Arbitrator Galicia just passed it off, okay, sure, fine. My objection is preserved when the evidence is offered, not when the deposition is taken, because for all we knew, the scientific basis could have been supplied in other evidence on the day of trial. Supreme Court Rule 211C, we do not have to object, and the procedures of the commission make it so that we really can't object until we know what's happening. And at the commission, we do things backwards. We take depositions before testimony. You can't know. The objection was made. We object. We have no objection to the introduction of Dr. Fournier's deposition other than the objection stated within the depositions, which had nothing to do with this. If you're setting aside all of the machinations, the procedural history, you're really objecting. Are you not in candor on the conclusion that or the ultimate result or opinion that Fournier opines? Yes. Okay. Nobody's disputing the progressive illness, nature of the illness. Nobody's disputing the trauma, hitting his head in the doorknob. I mean, none of that's in dispute. None of it's in dispute. The facts are not in dispute. You're saying Fournier's opinion is the first time in the history of the entire world that some doctor has opined this conclusion, and therefore the commission should give it no weight, basically, or a little weight when compared to the opinion of your doctor. That's the important part. When compared, when compared, we have all of medicine arrayed against Dr. Fournier. But for some reason the commission hung its head on Fournier. Yes, it did. Probably hung its head on Fournier because the guy was totally asymptomatic before this event and relatively stable, and then all of a sudden he has a sudden deterioration. There is no suddenness to this case. Dr. Fournier bases his opinion on several things, one of which is holy mackerel. The man got whacked in the nose and there was a sudden deterioration. That assertion is belied by the petitioner's own testimony at page 71 of the record. His own words from his own mouth were, my vision deteriorated over a 12-month period, 12 months. Dr. Fournier, on cross-examination, admitted that if this took six months or a year to occur, then I would conclude that there was no causal connection. The petitioner testified about short periods of time. There's even a hint in a medical record. I attribute that, frankly, to human frailty. Was he driving a car before the accident? Yes. And then after this accident, when did he stop driving the car? I must say that I don't have that figure. It was not long. Okay. We have, you're saying, the acceleration of the deterioration, but is there not some evidence in the record that it's not asymmetrical and that that's significant? The asymmetry is mentioned. And the disease frequently goes like this and not like this. But following this traumatic incident. He had losses in both eyes, which were not numerically the same either. There was some very difficult calculations of visual loss. Well, obviously both eyes were not the same in pair before the accident. They were neither the same before nor after. So you're saying that there's no evidence in the record that we'd be talking about symmetry and deterioration, not there'd be a discrepancy at point A, there'd be a discrepancy at point B, but the speed with which each eye deteriorated was not asymmetrical. Is that the evidence? Would Your Honor say that again, please? Well, you'll have time on rebuttal. Your time is up. Okay. Thank you. May it please the Court, Counsel, good morning, Justices. My name is Bob Cozy and I represent Mark Karuba in this matter. The issue is simply one of causal connection. There are two ways that you can prove causal connection according to the case law in Illinois. The first is through expert testimony. And the other is through an expert witness. The second is through the so-called chain of events method of proof of causation. It is our position that we have proof causation through both methods of proof. With respect to the expert testimony, we produced the testimony of Dr. Fournier, an ophthalmologist. He testified clearly that the injury, which was a very significant blow to the nose, causing a fracture, this is a fracture to the bone, not to the cartilage that we sometimes see, very significant trauma accelerated the cone rod dystrophy that this gentleman had, leading to legal blindness over a period of three months. What's your reaction to your opponent's argument that he's the only doctor in the history of medicine to ever opine that specific opinion? Well, as we walk back from this courtroom, I would like to find out from Counsel how it is he came to that conclusion. I think he overreached on that very significantly. There is no such evidence that he was the only doctor who ever testified that cone rod dystrophy could be accelerated. What Counsel, I think, wanted to say was that there was no literature out there that says that this can happen. And if you will read Donaldson, which my opponent has cited in his brief, they address the issue of whether or not it's important that there be some literature out there to support a scientific opinion. And they said, you don't need it. They said, look it, there is no literature saying that this cannot happen. So just because my opponent says that there's no literature out there saying that this can happen, that doesn't carry any weight in Illinois according to the case that he cited in his own brief. What about his argument about a fry hearing was necessary? Well, I think he should have presented a fry hearing. What he should have done, because he told you that these depositions were taken before the case went to hearing, he could have gone into the arbitrator, made a motion, I want a fry hearing before this case ever goes to hearing to see if there should even be a hearing, if there's any basis for a hearing, if this testimony doesn't meet the standard in fry. He didn't do that. He didn't mention a word about fry when it was offered into evidence. He said, I dispute the scientific basis of the opinion, but that was his only objection. Well, let me ask you the next logical question. Are you agreeing that a fry hearing was necessary in light of the nature of the opinion here? I think that he should have, and I think that he waived it by not requesting it. So you think a fry hearing was necessary? Well, I think he could have done it and should have done it, yes. Right. But let's get aside for a minute. Do you think a fry hearing was necessary? Well, I think he waived the objection. I think that he doesn't meet the standard in fry, if that's what you're asking me. That's what I'm asking. Yes. No, I don't think he does. Because the opinion of Dr. Fournier is based on sound scientific principles. Let's go through the scientific principles that he relied upon. He talked about vecular forces being transmitted to the nasal bone and to the eye orbits. That's scientific. He talked about the swelling that goes in from the nose area to the adjacent eyes. The swelling, the edema, causes damage to an effective area, causes damage to the retina. That's scientific. He looked at the eye tests that were performed on this gentleman throughout the years and said, look at this man had a stable condition with a cone rod dystrophy, and afterwards this man dropped right off the ledge over a period of 90 days. I want to stop there. I want to get something straightened out. Fournier said that your client had a traumatic decrease in vision and sudden deterioration. Your opponent, when I asked that question, told me that this all occurred over a 12-month period. Did your client testify that prior to the accident he was able to read and could drive a car? Yes, he did. Did he also testify that after the accident he noticed that he was unable to read normal print and he was unable to focus sufficiently to drive? Yes, he did. Did he also testify that the degeneration of his eyesight occurred in, quote, the month immediately following the accident, close quote? Yes, he did. And to the point of what counsel quoted, and he took this one excerpt out of the evidence about it continued to deteriorate over 12 months, it did. It deteriorated even after he reached the point of legal blindness in 90 days. So it can deteriorate beyond legal blindness. And that's what my client testified to. Dr. Fournier, my opponent will have you believe, is some type of mad scientist coming up with some crazy way out theory in the case. If you will look at Dr. Fournier's credentials, he is the editor of the International Journal of Ophthalmological Surgery, a publication that gets sent to 25,000 ophthalmologists all over the world. He's a professor at Northwestern University. My opponent's portrayal of him as being some type of fringe individual I don't think is fair and I don't think it's consistent with the evidence, and certainly the commission didn't think that there was anything wrong with the credentials. If you look at what the commission decision said, he is widely published. His learned publications, they spoke in very impressed terms of Dr. Fournier, and I think you will have to agree, too, that this gentleman is not outside the mainstream. All right. For you, then, in summary, this is a simple case you're saying. You've got Fournier's opinion, clearly, that the trauma accelerated the deterioration of your client's eyesight. He points to Goldenbrenner's as the opposite. It's up to the commission to weigh the credibility and believability of the witnesses and the weight to be given. That's what this comes down to, right? It does, Your Honor. And if I could also address the chain of events. You sort of have done that, haven't you, that you had this condition, you had the trauma, you pointed out the specific acceleration that was caused by the trauma. I mean, is that what you're talking about? Yes, Your Honor. And also, too, if you will look at the driving records. We not only had him testify that he was driving, he had no problems driving. We put in the Secretary of State's records that show that his eyesight was tested in 1995. It was about a year and ten months before. And he had the visual acuity. Dr. Goldenbrenner's theory about this was a gradual deterioration over a long period of time. She just ignores that evidence. Most of her opinions she's ignoring in her analysis. How do you ignore the fact that the man is working every single day as a dispatcher looking at computers, looking at bills of lading? It's a hectic case. But she's not disputing deterioration. Well, that's irrelevant. What she's just arguing is that the nature of the degeneration, she says it's a metabolic process, not a traumatic process. That's all it boils down to. So, I mean, that's her point of scientific disagreement, it seems to me. And that opinion and analysis was rejected by the commission. And it's basically as simple as that. Thank you. Thank you, Counselor. Counsel, you may have rebuttal. Well, as to Dr. Fournier being the Christopher Columbus of medicine, it is true that there is no record in the medical literature of anyone agreeing with Dr. Fournier's opinion. How do we know that? Pardon me? How do we know that? Dr. Goldenbrenner performed that analysis. She says so. She says so. She says she not only has her own opinion, but it does not. But she didn't stop with that. She went and researched all the medical literature. Nobody. Well, there always has to be a first time correct on any scientific case. That's the Christopher Columbus theory. We can't rule out the possibility that he is the Christopher Columbus of medicine. But if he were, would he have hid his light under a bushel, the editor of the magazine? Well, we don't know. Because it is true. You emphasized very clearly, I think effectively in your brief, that we cannot decide the case based on speculation and conjecture. And now you're sort of leading off on your own speculation and conjecture, are you not? Yes, but mine is directed at a knowable quantity, human nature. We're not taking you down to medical speculation. We're taking you into what human beings would do. There are no humble people. Pardon me? There are no humble people. Careful, you're on the record. I've never been plagued with humility myself, perhaps. May I mention one other thing? Dr. Fournier admits that he is surmising, surmising. When asked a question, his medical opinion is based upon there being ocular damage, trauma transmitted to the eye, physical, mechanical trauma. When we asked him, Doctor, do you know that that happened? Is there any evidence of that? Is there any anything? No, there's not. No evidence of any such damage to petitioner's eyes was ever disclosed. Dr. Fournier could only surmise there may have been such damage. The doctor emphasized that he was surmising when he answered absolutely to the question. So you're just surmising that there was such damage? His opinion is predicated on speculation. That is not the basis upon which an award can be made. He's surmising. Thank you, Counselor. Thank you. Do we have any time left? Pardon? Do I have any time left? No. Thank you, Counselor. Thank you. Do you want to take that for me? Court will stand and break recess.